IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR MORGAN STANLEY BANK OF AMERICA MERRILL LYNCH TRUST 2014-C19, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2014-C19<br><br>Plaintiff,<br><br>-vs-<br><br>MICHAEL KLEIN and EK 2013 FAMILY TRUST, a Florida Trust<br><br>Defendants. | Case No: 1:22-cv-09266 |

# COMPLAINT

Wilmington Trust, National Association, as Trustee for Morgan Stanley Bank of America Merrill Lynch Trust 2014-C19, Commercial Mortgage Pass-Through Certificates, Series 2014-C19 ("Plaintiff" or "Lender"), by and through its special servicer, Rialto Capital Advisors, LLC, by undersigned counsel, files this Complaint against Defendants Michael Klein and the EK 2013 Family Trust, a Florida Trust ("Defendants" or "Guarantors"). In support of the Complaint, the Plaintiff states as follows:

## NATURE OF THE ACTION

1. Plaintiff is the holder of a defaulted 2014 mortgage loan (the "Loan") secured by shopping centers in Houston, Texas and Chicago, Illinois.

2. As guarantors of the Loan, Defendants Michael Klein and the EK 2013 Family Trust are personally liable for (i) all losses resulting from misrepresentations in the Loan

Documents and meritless foreclosure defenses; and (ii) the entire debt upon the occurrence of certain trigger events.

3. The Borrowers (as hereinafter defined) provided a representation and warranty at closing that "***after due inquiry***, there exists no structural or material defects or damages in the Property, as a result of a casualty or otherwise, and ***whether latent or otherwise***." This representation was untrue.

4. The Chicago property is constructed on a landfill, suffers from persistent severe subsidence, and requires millions of dollars of immediate repairs and on-going maintenance. According to structural engineers that have surveyed the property, subsidence was recognized as a risk when the shopping center was constructed in 1990, has been occurring continuously since that time, and will remain a problem in the future.

5. Upon information and belief, in 2014 the subsidence problem was known to the prior owner, the Borrower's property manager and several tenants. At that time repairs had already been performed at one or more units and provisions addressing subsidence were being included in in leases.

6. The subsidence problem was not disclosed to the Lender until September 2022 despite an on-going contractual duty of disclosure.

7. Further, as is common for securitized loans, full recourse is triggered if the Borrowers incur any debt other than the Loan and incidental trade debt. Here the Borrowers became net debtors to their affiliates beginning in 2015 and accumulated over $ 4 million of impermissible debt by the time they defaulted on their payments in October 2021.

## PARTIES

8. Plaintiff is a New York common law trust with Wilmington Bank, National Association as its trustee. Wilmington Bank, National Association's Articles of Association designate Wilmington, Delaware as the location of its main office. The Plaintiff is therefore a citizen of Delaware.

9. Michael Klein is a natural person and a citizen and resident of Brazil.

10. The EK 2013 Family Trust is Florida common law trust with Alex Kurkin as its trustee. Mr. Kurkin is a citizen and resident of Florida. Consequently, the EK 2013 Family Trust is a citizen of Florida.

## JURISDICTION

11. The Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a) because the adverse parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

12. Jurisdiction exists in New York State pursuant to General Obligations Law § 5-1402 and the consent of all parties given in the Loan Agreement.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and by agreement among the parties.

## FACTS

**The Loan**

14. MikeOne EK Houston Holdings, LLC ("MikeOne Houston") and MikeOne EK Chicago Holdings, LLC ("MikeOne Chicago" and collectively with MikeOne Houston, the

"Borrowers") are joint and several obligors on a Promissory Note dated November 13, 2014 in the original principal amount of $51,390,000 (the "Loan").

15. The Loan was originated by Bank of America, N.A. and acquired by the Plaintiff shortly after closing.

16. The Note is secured by two mortgages granting first priority liens on shopping centers in Houston, Texas (the "Houston Property") and Chicago Illinois (the "Illinois Property" and collectively, the "Properties").

17. Additional terms and conditions of the Loan are set forth in a Loan Agreement of even date. A copy of the Loan Agreement is attached as <u>Exhibit A</u>.

18. The Borrowers gave numerous representations and warranties in the Loan Agreement to induce Bank of America to make the Loan, including the following:

> **Section 4.8. <u>Full and Accurate Disclosure</u>**. No statement of fact made by or on behalf of Borrower in this Agreement or in any of the other Loan Documents or in any other document or certificate delivered by or on behalf of Borrower contains any untrue statement of a material fact or omits to state any material fact, to Borrower's knowledge, necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower which has not been disclosed which would reasonably be expected to have or does have a Material Adverse Effect.
>
> **Section 4.23. <u>Physical Condition</u>**. …Except as set forth in the Property Condition Report, to Borrower's knowledge ***after due inquiry***, there exists no structural or other material defects or damages in the Property, as a result of a Casualty or otherwise, and ***whether latent or otherwise***…. (Emphasis supplied).

19. The Property Condition Report does not mention subsidence or settling of the buildings at the Chicago Property, nor any risk related to construction on a landfill.

20. The Loan Agreement states, "All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed

to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf." Exhibit A, § 4.41.

21. The Borrowers are also bound by certain covenants governing the Loan and the operation of the Properties while the Loan is outstanding, including the following:

> **Section 5.2. Maintenance and Use of Property.** Borrower shall cause each Individual Property to be maintained in a good, safe and insurable condition and in compliance with all applicable Legal Requirements, and shall promptly make all repairs to each Individual Property, ***above grade and below grade***, interior and exterior, structural and nonstructural, ordinary and extraordinary, unforeseen and foreseen except where the failure to so comply would not reasonably be expected to have and does not have a Material Adverse Effect. All repairs made by Borrower shall be made in a good and workmanlike manner, shall be equal or better in quality and class to the original work and shall comply with all applicable Legal Requirements and insurance requirements. (Emphasis supplied).
>
> **Section 5.7. Notice of Default.** Borrower shall promptly advise Lender (a) of any event or condition that would reasonably be expected to have or does have a Material Adverse Effect of which Borrower has knowledge, and (b) of the occurrence of any Default or Event of Default of which Borrower has knowledge.

**The Guaranty**

22. As further assurance for repayment of the Loan, Michael Klein ("Mr. Klein") and the EK 2013 Family Trust (the "Family Trust" and collectively with Mr. Klein "Defendants" or "Guarantors") executed a Guaranty Agreement (the "Guaranty").

23. Pursuant to the Guaranty, Mr. Klein and the Family Trust are jointly and severally liable for all "Guaranteed Obligations" as defined in § 15.1 of the Loan Agreement.

24. Pursuant to § 15.1 of the Loan Agreement, Guaranteed Obligations include all losses due to:

> (i) fraud or intentional misrepresentation by an Exculpated Party in connection with the execution and the delivery of this Agreement, the Note, the Mortgage, any of the other

                    Loan Documents, or any certificate, report, financial statement or other instrument or document furnished to Lender at the time of the closing of the Loan or during the term of the Loan;

    (ii)    the gross negligence or willful misconduct of an Exculpated Party…

    (x)    any Borrower's assertion or raising of any defense to a proceeding instituted by Lender (whether judicial or otherwise) for the foreclosure of the Mortgage following an Event of Default caused by Borrower's failure to timely pay the Monthly Payment Amount or the Debt due on the Maturity Date, which defense is determined by a court of competent jurisdiction to be without merit or brought in bad faith …

25.    In addition to losses resulting from certain enumerated events, the Guaranteed Obligations include the entire amount owed on the Loan if, among other triggers, "***any Borrower incurs any Indebtedness other than the Debt and Permitted Debt without the prior written consent of Lender or except as expressly permitted in this Agreement***". (Emphasis supplied).

26.    "Permitted Debt" is limited to short term, unsecured trade and operational debt and no other term of the Loan Agreement allows additional debt.  <u>Exhibit A</u>, pg. 15.

**Subsidence Issues at the Chicago Property**

27.    The Chicago Property was constructed in 1990 on a closed landfill.

28.    At the time of its construction, the risk of future settling due to the high level of moisture and type of fill beneath the building was recognized in engineering reports.

29.    Subsidence has been occurring at the Chicago Property, upon information and belief, since it was built.

30.    As early as 2001, at least one tenant insisted on the inclusion of language it its lease addressing subsidence at the Chicago Property.

31. Repairs to persistent sinking, performed using a process known as "slab-jacking," were performed at the Chicago Property prior to 2014.

32. The Lender first learned of a subsidence problem at the Chicago Property in or about September 2021 when the Borrower forwarded a February 2020 engineering report prepared by Klein and Hoffman (the "K&H Report"). A copy of the K&H Report is attached as Exhibit B.

33. At that time "moderate to severe settlement was noted throughout the property". In particular, the Burlington Coat Factory ("Burlington") store was suffering from up to 8.5 inches of subsidence, potentially compromising the structural integrity of the mezzanine level.

34. Severe subsidence has also resulted in cracked building facades, abrupt elevation changes in the parking lot and sidewalks, visibly uneven floors, damage to tenant equipment and sinking structural pillars which have compromised the roof.

35. In multiple areas the subsidence has resulted in walkway slopes exceeding ADA code limits.

36. Core samples of the slab and foundation revealed that the Chicago Property had undergone multiple rounds of repairs since construction, with additional subsidence occurring on top of prior repairs.

37. Burlington has complained for years about subsidence in its unit and the Borrowers' failure to adequately address the problem.

38. According to the K&H Report, prior rounds of slab-jacking exacerbated the subsidence because they were performed with concrete, rather than polyurethane, thereby increasing the weight of the slab and accelerating further compression of the fill beneath the building.

55804701

39. Reports prepared at the time of construction identified subsidence as a long-term risk at the Property.

40. The K&H Report states that subsidence is likely to continue for the indefinite future and require monitoring and regular repairs.

41. Despite the post-origination repairs, the financial reporting and budgets submitted to the Lender gave no indication of unexpected capital expenses or the substantial deferred maintenance costs accruing because of subsidence.

**The Borrowers' Accumulation of Debt**

42. The Borrowers are prohibited from incurring virtually any debt other than the Loan and incidental trade debt. Exhibit A, pgs. 7, 15 (definitions of "Indebtedness" and "Permitted Debt").

43. Notwithstanding this prohibition, the Borrowers became net debtors to their affiliates almost immediately after closing the Loan. A chart detailing the Borrowers' increasing debt from origination through the end of 2021 is attached as Exhibit C.

44. By the end of 2021, the Borrowers had jointly accumulated $4,047,510 of debt.

45. The Lender did not give advance written consent for any of the debt in Exhibit C.

46. This debt does not fit within the definition of "Permitted Debt" and is not permitted by any other term of the Loan Agreement.

**The Foreclosure Actions**

47. The Borrowers' failed to make the October 1, 2021, payment due on the Loan and each and every payment thereafter.

48. The unpaid principal balance of the Loan is $44,430,712.59.

49. When the payment default occurred, the Houston Property was almost completely vacant and tenants at the Chicago Property had begun to refuse lease extensions because of the Borrowers' failure to address the subsidence problem.

50. In particular, Burlington has delayed renewing its lease and Food 4 Less, an anchor supermarket, has served a Notice of Breach of Lease based on the failure to address subsidence.

51. The Lender initiated foreclosure actions in Illinois and Texas to obtain title to the Properties and prevent any further deterioration in value.

52. To date the Borrowers have vigorously defended these foreclosure actions by, among other things, interposing affirmative defenses, opposing summary judgment, and seeking expansive discovery.

53. As a result of the Borrowers' actions, the Lender has incurred and continues to incur substantial expenses, including legal fees, prosecuting the foreclosure actions.

54. The value of these Properties continues to deteriorate because of the uncertainty and delay that accompanies foreclosure.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
**(Breach of Guaranty Representations and Warranties at Origination)**

55. Paragraphs 1 through 54 are repeated as if more fully stated herein.

56. The Borrower represented at origination that "***after due inquiry***, there exists no structural or other material defects or damages in the Property, as a result of a Casualty or otherwise, and ***whether latent or otherwise***…".

57. The prior history and future likelihood of subsidence at the Chicago Property constitutes both a current and latent defect.

58. Upon information and belief, the Borrower was fully aware of the subsidence issue based on prior reports and leases that were in its possession, and the problem was well known to

tenants and the property manager. Nevertheless, the Borrower withheld this information from the Lender.

59. If the history and future risk of subsidence at the Chicago Property had been disclosed, as it was required to be, the Lender would not have acquired the Loan.

60. Alternatively, the Lender would have required mitigation of existing subsidence and funding of a dedicated reserve for monitoring and repairs during the term of the Loan.

61. The Borrowers further represented that it would promptly notify Lender of any condition that could have a "Material Adverse Effect" on the Property and that it would perform all repairs above and below grade in a good and workmanlike manner and maintain the Property in compliance with all codes.

62. The prior slab-jacking at the Property was not performed according to industry standards and the failure to properly monitor and repair the Property has resulted in numerous code violations.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Breach of Guaranty – Prohibited Debt)

63. Paragraphs 1 through 62 are repeated as if more fully stated herein.

64. The term "Guaranteed Obligations" unambiguously includes the entire amount owed on the Loan if the Borrowers incur any "Indebtedness" other than the Loan and "Permitted Debt".

65. The Borrowers have incurred more than $4 million of additional debt since origination.

66. The Lender did not give advance written consent for the Borrowers to incur additional debt.

-10-

67. The Borrowers' additional debt is not within the definition of "Permitted Debt" as and is not otherwise allowed by the Loan Agreement.

### AS AND FOR A THIRD CLAIM FOR RELIEF
**(Breach of Guaranty – Defense to Foreclosure)**

68. Paragraphs 1 through 67 are repeated as if more fully stated herein.

69. The Borrowers do not dispute that they failed to make the Loan payment due on October 1, 2021 and each and every payment thereafter.

70. Despite the undisputed monetary default, the Borrowers have defended and continue to defend against foreclosure actions in Illinois and Texas, causing the Lender to incur substantial legal expenses.

71. The Defendants' foreclosure defenses are meritless.

72. The "Guaranteed Obligations" include all costs and expenses resulting from foreclosure defenses found by a court to be without merit or brought in bad faith.

**WHEREFORE**, the Plaintiff respectfully demands judgment against Defendant awarding to Plaintiff:

**On Count I**:

i. Money damages in an amount to be determined at trial, together with pre- and post-judgment interest as provided by law;

ii. Reasonable attorneys' fees; and

iii. Such other and further relief as to the Court seems just, equitable, and fair, including the costs and expenses of this case.

**On Count II**:

i. Money damages in the total amount owed on the Loan with such amount to be determined at trial, together with pre- and post-judgment interest as provided by law;

ii. Reasonable attorneys' fees; and

iii. Such other and further relief as to the Court seems just, equitable, and fair, including the costs and expenses of this case.

**On Count III**:

i. Money damages in an amount to be determined at trial representing the costs and damages resulting from the Borrowers' defense of the foreclosure actions, together with pre- and post-judgment interest as provided by law;

ii. Reasonable attorneys' fees; and

iii. Such other and further relief as to the Court seems just, equitable, and fair, including the costs and expenses of this case.

Dated: October 28, 2022

Respectfully submitted,

VENABLE LLP

By:    /s/ *Brent W. Procida*
      Gregory A. Cross
      Brent W. Procida
      750 East Pratt Street, Suite 900
      Baltimore, Maryland 21202
      Telephone: (410) 244-7400

*Counsel for Wilmington Trust, National Association, as Trustee for Morgan Stanley Bank of America Merrill Lynch Trust 2014-C19, Commercial Mortgage Pass-Through Certificates, Series 2014-C19*

-12-
55804701